UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

JOSEFINA QUEZADA, individually and on behalf of all others similarly situated,

    Plaintiff,

  v.

LOAN CENTER OF CALIFORNIA, INCORPORATED, EMC MORTGAGE CORPORATION, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., THE BANK OF NEW YORK MELLON, and DOES 1 through 10, inclusive,

    Defendants.
_____/

NO. CIV. 08-177 WBS KJM

<u>MEMORANDUM AND ORDER RE:
MOTION TO DISMISS</u>

----oo0oo----

    Plaintiff Josefina Quezada has filed this putative class action lawsuit against defendants Loan Center of California, Incorporated ("LCC"), EMC Mortgage Corporation ("EMC"), Structured Asset Mortgage Investments II, Inc. ("SAMI"), and The Bank of New York Mellon ("Mellon") alleging violations of federal and California state law relating to her purchase of an

1

1  Option Adjustable Rate Mortgage ("OARM").  Presently before the
2  court is defendants' motion to dismiss pursuant to Federal Rule
3  of Civil Procedure 12(b)(6).
4  I.   Factual and Procedural Background
5           On March 6, 2006, plaintiff and defendant LCC entered
6  into a written OARM agreement for $252,000.  (Second Am. Compl.
7  ("SAC") ¶ 2; id. Ex. 1 at 1 ("Note") § 1.)  The OARM was secured
8  by plaintiff's primary residence and had a forty-year maturity.
9  (SAC ¶ 2; Note § 3.)  The terms of the agreement were contained
10 in an Adjustable Rate Note ("Note"), which was accompanied by a
11 Truth-in-Lending Disclosure Statement ("TILDS").  (SAC ¶ 2.)
12          The Note provided that plaintiff would pay interest at
13 a yearly rate of 1.75 percent "until the first Change Date,"
14 which was May 1, 2006.  (Note §§ 2, 4(A).)  On May 1, 2006, "and
15 on that day every month thereafter," plaintiff's interest rate
16 would adjust to 3.825 percent plus the "Current Index," which was
17 the most recent twelve-month average of annual yields on actively
18 traded U.S. Treasury Securities.  (Id. § 4(A)-(C).)
19          The Note also provided that plaintiff would make
20 monthly payments of $730.28 "until the first Payment Change
21 Date," which was May 1, 2007.  (Id. § 4(B), (E).)  On May 1,
22 2007, "and on the same date each twelfth month thereafter,"
23 plaintiff's monthly payment would be recalculated to repay the
24 projected principal balance in equal amounts.  (Id. § 4(E).)
25 However, a new monthly payment could not increase or decrease
26 from the previous monthly payment by more than 7.5 percent.
27 (Id.)
28          The Note explained that since the monthly payment

2

changed less frequently than the interest rate, and since the monthly payment could not change more than 7.5 percent per year, a monthly payment "could be" less than the interest portion owed for that month. (Id. § 4(G).) If this occurred, the Note Holder would subtract the monthly payment from the interest portion and add the difference to the principal amount owed. (Id. § 4(G).) This process is called "negative amortization." (Id.)

If the principal grew to 110 percent of the original amount borrowed, a new monthly payment was to be calculated to repay the principal balance in equal amounts, notwithstanding the 7.5-percent limit on payment increases. (Id. § 4(H).) A new monthly payment would also be calculated, notwithstanding the 7.5-percent limit on payment increases, on May 1, 2011, and every fifth year thereafter. (Id. § 4(I).)

Plaintiff alleges that "the loan documents indicated that the loan would have a very low payment for the first three (3) to five (5) years" based on a "low listed interest rate." (SAC ¶¶ 23-25.) However, "the low 'teaser' rate was illusory"; although plaintiff's monthly payments remained low, the interest rate applied to her loan "was immediately and significantly increased" after she entered into the OARM agreement. (Id. ¶¶ 25, 30.) Accordingly, her monthly payments were insufficient to cover both interest and principal owed, which resulted in negative amortization. (Id. ¶ 30.)

Plaintiff also alleges that the documents failed to disclose that her loan "was designed to, and did, cause negative amortization to occur." (Id. ¶ 23.) Specifically, plaintiff contends that the documents "stated that negative amortization

3

was only a mere possibility" and failed to disclose that "negative amortization was absolutely certain to occur if consumers followed the payment schedule listed . . . in the TILDS." (Id. ¶ 31.) Plaintiff also asserts that defendants "were acting in concert or participation with each other" in "promoting, marketing, distributing, and selling" her OARM loan and other loans like it. (Id. ¶¶ 16, 9.)

Plaintiff filed her Complaint against LCC on January 24, 2008, alleging (1) violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f; (2) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17509; (3) fraudulent omissions; (4) breach of contract; and (5) tortious breach of the implied covenant of good faith and fair dealing. (Docket No. 1.) Plaintiff soon discovered, however, that LCC was no longer in business. (Ex Parte App. to File SAC ¶ 3.) She then applied for and received permission from the court to obtain formal discovery from third parties to identify subsequent purchasers of her loan. (Docket Nos. 14, 15.) After conducting discovery, plaintiff filed a Second Amended Complaint ("SAC") on August 12, 2008, adding defendants EMC, SAMI, and Mellon. (Id. No. 20.)

In her SAC, plaintiff alleges that EMC purchased or is otherwise an assignee of her loan with LCC. (SAC ¶ 4.) Plaintiff also alleges that SAMI and Mellon are Delaware corporations that presently own or owned "the Option ARM loans . . . that are the subject of [her] Complaint." (See id. ¶¶ 5-6.) Defendants EMC, SAMI, and Mellon now move to dismiss plaintiff's SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for

4

1 failure to state a claim upon which relief can be granted.

2 II.  Discussion

3     A.  Legal Standard

4     On a motion to dismiss, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984); Cruz v. Beto, 405 U.S. 319, 322 (1972). To survive a motion to dismiss, a plaintiff needs to plead "only enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). Dismissal is appropriate, however, where the plaintiff fails to state a claim supportable by a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990); see also Conley v. Gibson, 355 U.S. 41, 47 (1957) (complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"), abrogated on other grounds by Twombly, 127 S. Ct. at 1968.

    In general, the court may not consider materials other than the facts alleged in the complaint when ruling on a motion to dismiss. Anderson v. Angelone, 86 F.3d 932, 934 (9th Cir. 1996). The court may, however, consider additional materials if plaintiff has alleged their existence in the complaint and if their authenticity is not disputed. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002).

    Plaintiff has provided the court with her Note and

5

TILDS.  (SAC Ex. 1 at 1, 6.)  Plaintiff has alleged the existence of these documents in her SAC (SAC ¶ 2), and no party has questioned their authenticity.  Accordingly, the court will consider these documents in deciding this motion.

### B. Claims Against SAMI

Defendants move to dismiss all claims against SAMI because it is a trust and therefore lacks the capacity to be sued.  (Defs.' Mot. Dismiss 7.)  In the SAC, however, plaintiff alleges that SAMI is a Delaware corporation (SAC ¶ 5), and defendants provide no exhibits subject to judicial notice that refute this allegation.  Accordingly, the court must accept the allegations in the SAC as true, see Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996), and therefore will deny defendants' motion to dismiss all claims against SAMI.

### C. TILA Claim for Damages

An action for damages under TILA must be brought "within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).  A TILA violation occurs on "the date of consummation of the transaction," King v. California, 784 F.2d 910, 915 (9th Cir. 1986), and "consummation" means "the time that a consumer becomes contractually obligated on a credit transaction," 12 C.F.R. § 226(a)(13).  The doctrine of equitable tolling, however, "may . . . suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action."  King, 784 F.2d at 915.

A district court may grant a motion to dismiss on statute of limitations grounds "only if the assertions of the

6

complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." Morales v. City of Los Angeles, 214 F.3d 1151, 1153 (9th Cir. 2000) (quoting Tworivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999)). "Generally, the applicability of equitable tolling depends on matters outside the pleadings, so it is rarely appropriate to grant a Rule 12(b)(6) motion to dismiss . . . if equitable tolling is at issue." Huynh v. Chase Manhattan Bank, 465 F.3d 992, 1003-04 (9th Cir. 2006) (citing Supermail Cargo, Inc. v. United States, 68 F.3d 1204, 1206 (9th Cir. 1995)); see Cervantes v. City of San Diego, 5 F.3d 1273, 1276 (9th Cir. 1993) (providing that the application of equitable tolling "is not generally amenable to resolution on a Rule 12(b)(6) motion").

Plaintiff consummated her OARM on March 6, 2006, but did not file this action until January 24, 2008. Nonetheless, the court cannot conclude that the allegations in the SAC foreclose equitable tolling as a matter of law. See Cervantes, 5 F.3d at 1277 (holding that equitable tolling must be considered when the complaint "adequately alleges facts showing the potential applicability of the tolling doctrine" (emphasis added)). Plaintiff alleges that the Note and TILDS did not clearly and conspicuously disclose the terms of her OARM. The nature of these allegations makes plausible plaintiff's inability to discover the alleged disparity between the disclosure documents and the actual terms of her OARM. See King, 784 F.2d at 915 (reversing and remanding the dismissal of an untimely TILA suit because "equitable tolling involve[s] factual determinations"). Accordingly, defendants' motion to dismiss

7

plaintiff's TILA claim for damages must be denied.

    D.   <u>UCL Claims</u>

        1.   <u>TILA Preemption</u>

"There are two types of implied preemption: field preemption and conflict preemption." <u>Whistler Invs., Inc. v. Depository Trust & Clearing Corp.</u>, 539 F.3d 1159, 1164 (9th Cir. 2008). Field preemption is implied when Congress "'so thoroughly occupies a legislative field' that it effectively leaves no room for states to regulate conduct in that field." <u>Id.</u> (quoting <u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504, 516 (1992)). Conflict preemption examines a federal statute as a whole to determine whether compliance with both federal and state law is impossible or whether state law frustrates Congress's purpose. <u>Id.</u> (citing <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 373 (2000)).

The subchapter of TILA that is relevant to plaintiff's SAC provides the following preemption provision:

> [T]his part and parts B and C of this subchapter do not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency. . . . If [the Board of Governors of the Federal Reserve System] determines that a State-required disclosure is inconsistent, creditors located in that State may not make disclosures using the inconsistent term or form, and shall incur no liability under the law of that State for failure to use such term or form . . . .

15 U.S.C. § 1610(a)(1). In light of this statutory language, it is plain that "TILA neither expressly nor impliedly occupies the whole field of regulation." <u>In re First Alliance Mortgage Co.</u>, 280 B.R. 246, 251 (C.D. Cal. 2002) (citing <u>Williams v. First</u>

Gov't Mortgage & Investors Corp., 176 F.3d 497, 500 (D.C. Cir. 1999); Black v. Fin. Freedom Senior Funding Corp., 92 Cal. App. 4th 917 (2001)).  Rather, TILA "specifically allows for state law to supplement its enforcement scheme."  Id. at 250-51; see Williams, 176 F.3d at 500 ("Nothing in TILA or its legislative history suggests that Congress intended the Act's disclosure regime to provide the maximum protection to which borrowers are entitled nationwide; states remain free to impose greater protections for borrowers.").

As to conflict preemption, regulations interpreting TILA's preemption provision provide that "[a] State law is inconsistent [with TILA] if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law."  12 C.F.R. § 226.28(a)(1).  Here, plaintiff's UCL claims are predicated upon TILA violations; she does not contend that the UCL required defendants to "make disclosures" or use "term[s] or form[s]" that would contradict TILA's requirements.  Although the UCL provides a longer statute of limitations and may offer additional remedies, these factors alone do not render plaintiff's UCL claims inconsistent with TILA.  See First Alliance, 280 B.R. at 251 ("A Section 17200 claim merely advances the TILA purpose of meaningful disclosure of credit terms by providing increased penalties for non-disclosure."); Plascencia v. Lending 1st Mortgage, No. 07-4485, 2008 WL 4544357, at *7 (N.D. Cal. Sept. 30, 2008) ("[T]he fact that the UCL allows a claim to be brought within four years . . . simply provides an additional level of protection for consumers.").  Accordingly, the court concludes

that TILA does not preempt plaintiff's UCL claims.

2.  Assignee Liability

Defendants contend that they cannot be liable under the UCL because they are assignees of plaintiff's loan, not the original lender that provided the allegedly deficient disclosure documents. See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n, 494 F.3d 788, 808 (9th Cir. 2007) ("[A]n 'unfair practices claim under section 17200 cannot be predicated on vicarious liability . . . . A defendant's liability must be based on his personal participation in the unlawful practices and unbridled control over the practices that are found to violate section 17200 or 17500.'" (quoting Emery v. Visa Int'l Serv. Ass'n, 95 Cal. App. 4th 952, 964 (2002))).

Under TILA, however, "[a]ny person who purchases or is otherwise assigned a mortgage . . . shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage." 15 U.S.C. § 1641(d)(1).  In turn, "the UCL borrows violations of other laws . . . and makes those unlawful practices actionable under the UCL." Leonel v. Am. Airlines, Inc., 400 F.3d 702, 715 (9th Cir. 2005) (quoting Lazar v. Hertz Corp., 69 Cal. App. 4th 1494 (1999)).  Accordingly, since TILA provides that the purchase of a deceptive mortgage is itself actionable conduct, a UCL claim against an assignee whose own actions violate TILA cannot properly be described as imposing "vicarious" liability. See, e.g., Srithong v. Total Inv. Co., 23 Cal. App. 4th 721, 726 (1994) ("Vicarious liability 'means that the act or omission of one person . . . is imputed by operation of law to another[.]'"

10

1 (quoting <u>Far West Fin. Corp. v. D & S Co.</u>, 46 Cal.3d 796, 819
2 (1988) (Kaufman, J., concurring and dissenting))) (alteration in
3 original).

4      In addition, although the UCL does not provide for
5 vicarious liability, it does impose liability for "participation
6 in unlawful practices . . . by aiding and abetting the
7 principal." <u>In re First Alliance Mortgage Co.</u>, 471 F.3d 977, 996
8 n.6 (9th Cir. 2006) (quoting <u>California v. Toomey</u>, 157 Cal. App.
9 3d 1 (1984)).  A defendant "aids and abets the commission of an
10 intentional tort if the person knows the other's conduct
11 constitutes a breach of duty and gives substantial assistance or
12 encouragement to the other to so act." <u>Schulz v. Neovi Data
13 Corp.</u>, 152 Cal. App. 4th 86, 93 (2007) (quoting <u>Fiol v.
14 Doellstedt</u>, 50 Cal. App. 4th 1318, 1325 (1996)).

15      Here, plaintiff alleges that "[d]efendants, and each of
16 them, were engaged in the business of promoting, marketing,
17 distributing, and selling the Option ARM loans that are the
18 subject of this Complaint." (SAC ¶ 9.)  Plaintiff also alleges
19 that "[d]efendants, and each of them . . . were acting in concert
20 or participation with each other." (<u>Id.</u> ¶ 16.)  To the extent
21 that the OARM loans constituted an "unlawful, unfair, or
22 fraudulent business practice," these allegations present a
23 cognizable UCL claim under an aiding-and-abetting theory.

24      Accordingly, defendants' motion to dismiss plaintiff's
25 UCL claims must be denied.

26      E.   <u>Fraudulent Omissions</u>
27           1.   <u>TILA Preemption</u>
28      Defendants argue that TILA preempts plaintiff's

1 fraudulent-omissions claim.  Plaintiff's claim, however, does not
2 allege that defendants were required to "make disclosures" or use
3 "terms or forms" that would be inconsistent with TILA.  See 15
4 U.S.C. § 1610(a)(1).  Therefore, like plaintiff's UCL claims,
5 this cause of action supplements, rather than conflicts, with
6 TILA's enforcement scheme.  See supra Subsection II.D.1.
7 Accordingly, the court finds that TILA does not preempt
8 plaintiff's fraudulent-omissions claim.

         2.   <u>Duty to Disclose and Reliance</u>

10       Defendants also argue that plaintiff's fraud claim must
11 be dismissed because defendants, as assignees of plaintiff's
12 loan, did not owe plaintiff a duty to disclose after she
13 consummated her loan with the original lender.  Even if they did
14 owe such a duty, defendants further contend that plaintiff failed
15 to allege that she relied on any post-consummation omissions.

16       Plaintiff is not confined to rest her fraud claim on
17 any post-consummation duty owed by defendants or any reliance on
18 her part on post-consummation omissions.  Rather, if defendants
19 knew that the original lender's conduct constituted a breach of
20 duty and if they provided substantial assistance to that conduct,
21 defendants may be liable under an aiding-and-abetting theory.
22 See First Alliance, 471 F.3d at 993 (citing Casey v. U.S. Bank
23 Nat'l Ass'n, 127 Cal. App. 4th 1138 (2005)) (upholding a verdict
24 against defendant for fraud where the defendant securitized loans
25 that it knew were fraudulently originated and provided
26 substantial assistance to the original lender).  Accordingly, to
27 the extent that the original lender's conduct amounted to fraud,
28 plaintiff's allegations that defendants "were acting in concert

12

or participation with each other" and "were . . . promoting, marketing, distributing, and selling the Option ARM loans" are sufficient to state a claim of fraud against defendants.

F.  Breach of Contract

Plaintiff alleges that defendants breached the written OARM agreement in two respects.  First, defendants failed to apply an interest rate of 1.75 percent for the first three to five years of the loan.  (SAC ¶¶ 171, 175-76.)  Second, defendants failed to apply a portion of plaintiff's monthly payments to her principal balance.  (Id. ¶¶ 157-58.)

Regarding plaintiff's first ground for breach of contract, the Note provides, "Up until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of 1.750%."  (Note § 2.)  Section 4 of the Note states, "The interest rate I will pay may change on the 1st day of May, 2006" (id. § 4(A)), which is approximately two months after plaintiff consummated her loan.  The interest rate would continue to change "on that day every month thereafter."  (Id.) The express terms of the Note, therefore, directly contradict plaintiff's allegation that defendants were obligated to apply a fixed interest rate of 1.75 percent for the first three to five years of the loan.

Nonetheless, plaintiff argues that the schedule of payments provided in the TILDS "reflects payments based on an interest rate that was fixed for at least the initial period of three to five years . . . ."  (Pl.'s Opp'n 39; see also SAC ¶ 30.)  According to the Note, however, monthly payments may not reflect the actual interest rate charged for that month on the

13

unpaid principal.  Specifically, the Note provides, "Since my payment amount changes less frequently than the interest rate . . . my monthly payment could be less or greater than the amount of the interest portion of the monthly payment . . . ."  (Note § 4(G).)  Therefore, plaintiff cannot rest her breach-of-contract claim on defendants' failure to apply a fixed interest rate on her loan for three to five years.

Plaintiff's second ground for breach-of-contract relies on the following provision in the Note: "I will pay principal and interest by making a payment every month."  (Id. § 3(A).)  Plaintiff alleges that this provision is a promise by defendants to apply a portion of each monthly payment to her principal balance.  (SAC ¶¶ 157-58; see also Pl.'s Opp'n 40.)

When read in isolation, this provision may be susceptible to plaintiff's interpretation; however, under California contract law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Navarro v. Mukasey, 518 F.3d 729, 734 (9th Cir. 2008) (quoting Cal. Civ. Code § 1641).  Furthermore, "[i]t is well settled that '[w]here there is an inconsistency between general provisions and specific provisions [in a contract], the specific provisions ordinarily qualify the meaning of the general provisions.'" Pecarovich v. Allstate Ins. Co., 309 F.3d 652, 658 (9th Cir. 2002) (quoting Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc., 971 F.2d 272, 279 (9th Cir. 1992)) (second alteration in original).

The Note contains several specific provisions that

14

contradict plaintiff's interpretation.  In section 4(G), the Note provides the following language under the heading "Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization":

> [M]y monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal . . . .  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal . . . .

In addition, at the top of the first page of the Note, the following text appears in bold typeface: "MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED."  (Id. at 1.)

Collectively, these provisions indicate that monthly payments could be insufficient to cover the interest owed on the OARM.  If monthly payments fell below the interest owed, the Note Holder would apply the payment to the interest owed and add the difference to the principal balance.  In light of these provisions, it would be unreasonable to interpret the language "I will pay principal and interest by making a payment every month" as requiring defendants to necessarily apply a portion of each monthly payment toward plaintiff's principal balance.  Rather, consistent with the provision's location under the heading "Time and Place of Payments," it is properly viewed as describing the timing of loan payments, not dictating how the Note Holder will distribute payments to principal or interest.  See City of El Cajon v. El Cajon Police Officers' Ass'n, 49 Cal. App.4th 64, 71

1  (1996) ("When an instrument is susceptible to two
2  interpretations, the court should give the construction that will
3  make the instrument . . . reasonable and capable of being carried
4  into effect . . . ." (quoting Ticor Title Ins. Co. v. Rancho
5  Santa Fe Ass'n, 177 Cal. App. 3d 726, 730 (1986))).

6  Accordingly, because plaintiff's Note is not reasonably
7  susceptible to the only interpretation giving rise to her breach-
8  of-contract claim, plaintiff's breach-of-contract claim must be
9  dismissed.

   G.   Tortious Breach of the Implied Covenant of Good Faith
        and Fair Dealing

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Marsu, B.V. v. Walt Disney Co., 185 F.3d 932, 937 (9th Cir. 1999) (quoting Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 371 (1992)). "A typical formulation of the burden imposed by the implied covenant of good faith and fair dealing is 'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" Andrews v. Mobile Aire Estates, 125 Cal. App. 4th 578, 589 (2005) (quoting Gruenberg v. Aetna Ins. Co., 9 Cal.3d 566, 573 (1973)).

To the extent that plaintiff's claim is based on defendants' participation in the marketing, promotion, or distribution of her loan before consummation (SAC ¶ 193), the implied covenant of good faith and fair dealing is inapplicable. "[T]he implied covenant is a supplement to an existing contract, and thus it does not require parties to negotiate in good faith prior to any agreement." McClain v. Octagon Plaza, LLC, 159 Cal.

16

1  App. 4th 784, 799 (2008) (citing Racine & Laramie, Ltd. v. Dep't
2  of Parks & Recreation, 11 Cal. App. 4th 1026, 1031-35 (1992))
3  (emphasis added).
4          The remaining allegations supporting plaintiff's claim
5  are the same as those underlying her breach-of-contract claim.
6  Specifically, plaintiff alleges that defendants did not apply a
7  fixed interest rate for three to five years and did not apply her
8  monthly payments toward the principal balance owed.  (SAC ¶ 190.)
9  However, as discussed in Section II.F, supra, the very conduct
10 underlying plaintiff's claim is that which the contract directs
11 defendants to perform.  Although adherence to the terms of a
12 contract does not insulate a party against a claim of breach of
13 the implied covenant of good faith and fair dealing, Marsu, 185
14 F.3d at 937, compliance with contractual terms cannot serve as
15 the very basis for such a claim, see Racine, 11 Cal. App. 4th at
16 1032 (citing Gibson v. Gov't Employees Ins. Co., 162 Cal. App. 3d
17 441, 448 (1984)) (describing the purpose of the implied covenant
18 of good faith and fair dealing as "assuring compliance with the
19 express terms of the contract"); see also Gerdlund v. Elec.
20 Dispensers Int'l, 190 Cal. App. 3d 263, 277 (1987) ("There cannot
21 be a valid express contract and an implied contract, each
22 embracing the same subject, but requiring different results."
23 (quoting Shapiro v. Wells Fargo Realty Advisors, 152 Cal. App. 3d
24 467, 482 (1984))).
25         Accordingly, since any claim of pre-consummation bad
26 faith is not actionable and defendants' adherence to the contract
27 cannot itself constitute bad faith, defendants' motion to dismiss
28 plaintiff's claim of tortious breach of the implied covenant of

good faith and fair dealing must be granted.

IT IS THEREFORE ORDERED that defendants' motion to dismiss plaintiff's Second Amended Complaint be, and the same hereby is, GRANTED with respect to her fifth and sixth causes of action for breach of contract and tortious breach of the implied covenant of good faith and fair dealing; and DENIED with respect to all other claims.

Plaintiff has thirty days from the date of this Order to file an amended complaint, if she can do so consistent with this Order.

DATED:  November 24, 2008

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE