1  SHEPPARD, MULLIN, RICHTER &
   HAMPTON LLP
2   A Limited Liability Partnership
    Including Professional Corporations
3  ROBERT S. BEALL, Cal. Bar No.
   132016
4   rbeall@sheppardmullin.com
   SHANNON Z. PETERSEN, Cal. Bar No.
5  211426
    spetersen@sheppardmullin.com
6  650 Town Center Drive, 4th Floor
   Costa Mesa, California 92626-1993
7  Telephone:    (714) 513-5100
   Facsimile:    (714) 513-5130
8
   Attorneys for Defendants,
9  EMC Mortgage Corporation, Structured
   Asset Mortgage Investments II, Inc., and
10 Bank of New York Mellon Corporation

Of Counsel:
LEANN PEDERSEN POPE (*Admitted Pro Hac
Vice*)
 lpope@burkelaw.com
VICTORIA R. COLLADO (*Admitted Pro Hac
Vice*)
 vcollado@burkelaw.com
STEPHEN R. MEINERTZHAGEN (*Admitted Pro
Hac Vice*)
 smeinertzhagen@burkelaw.com
BURKE, WARREN, MACKAY &
SERRITELLA, P.C.
330 North Wabash Avenue, 22nd Floor
Chicago, Illinois 60611
Telephone:    (312) 840-7000
Facsimile:    (312) 840-7900

11

12                 UNITED STATES DISTRICT COURT

13                 EASTERN DISTRICT OF CALIFORNIA

14

15  JOSEFINA QUEZADA, individually and
    on behalf of all others similarly situated,
16
                     Plaintiff,
17
    vs.
18
    LOAN CENTER OF CALIFORNIA,
19  INCORPORATED, EMC MORTGAGE
    CORPORATION, STRUCTURED
20  ASSET MORTGAGE INVESTMENTS
    II, INC., THE BANK OF NEW YORK
21  MELLON CORPORATION, and DOES
    1 through 10 inclusive,
22
                     Defendants.
23

Case No. 2:08-cv-00177-WBS (KJM)

**EMC MORTGAGE CORPORATION,
STRUCTURED ASSET MORTGAGE
INVESTMENTS II, INC., THE BANK OF
NEW YORK MELLON CORPORATION'S
OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION**

Hon. J. William B. Shubb
Hearing Date: December 7, 2009
Time: 2:00 p.m.
Courtroom: 5, 14th Floor

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

Page

3

TABLE OF AUTHORITIES ..............................................................................................iii

4

INTRODUCTION ...............................................................................................................1

5

SUMMARY OF RECORD EVIDENCE..............................................................................3

6

7

       A.    Quezada's Loan Was Originated By Clarion Mortgage, A
             Mortgage Broker, Working Directly With Loan Center, The
             Lender That Funded And Closed Her Loan. ..................................................3

8

9

       B.    EMC Had No Involvement In The Origination Or Closing of
             Quezada's Loan And Had No Contact With Quezada Prior To
             Closing. ......................................................................................................9

10

ARGUMENT......................................................................................................................10

11

I.       STANDARDS FOR DETERMINING CLASS CERTIFICATION. .....................10

12

II.      RELIANCE AND CAUSATION ARE ELEMENTS OF QUEZADA'S
           FRAUD AND UCL CLAIMS. .................................................................12

13

14

       A.    To Have Standing To Pursue Her UCL Claims, Quezada Must
             Establish Reliance And Causation. .............................................................12

15

16

       B.    Quezada's Fraud Claim Requires Proof Of Causation And
             Reliance......................................................................................................12

17

       C.    No Class-Wide "Presumption" Of Reliance Applies Here. .........................13

18

III.     EVIDENCE RELEVANT TO QUEZADA'S CLAIM GOES FAR
           BEYOND THE LOAN DOCUMENTS. ................................................16

19

20

IV.    CERTIFICATION SHOULD BE DENIED BECAUSE QUEZADA
           CANNOT SATISFY THE REQUIREMENTS OF RULE 23(A). ..........................19

21

22

V.     INDIVIDUAL ISSUES OF RELIANCE AND CAUSATION
           PREDOMINATE OVER ANY COMMON ISSUES, THUS

23

           DESTROYING THE PREDOMINANCE AND SUPERIORITY

24

           REQUIREMENTS OF RULE 23(B) (3). ................................................21

25

       A.    Individual Issues Re lating To Absent Class Members' Fraud and
             UCL Claims ...............................................................................................22

26

27

            1.     Absent Class Member Discussions With Mortgage Brokers..........22

28

                                  **THE EMC DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2.    Absent Class Member Sophistication/Experience With ARM Loans ...................................................................24

3.    The CHARM Booklet .......................................................24

4.    Absent Class Member Reasons For Choosing An Option ARM Loan .......................................................................26

B.    Quezada's Arguments That Her Claims Can Be Decided With Class-Wide Proof Are Based On Unsubstantiated Statements That Ignore The Record Evidence And Misstate The Law. ................................27

VI.    QUEZADA HAS FAILED TO IDENTIFY AN ASCERTAINABLE CLASS. ............................................................................30

CONCLUSION ............................................................................33

**THE EMC DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

1

## <u>TABLE OF AUTHORITIES</u>

2

Page

3

### <u>Federal Cases</u>

4

*Adams v. U.S.*, No. CIVS040979, 2006 WL 618293 (E.D. Cal. Mar. 10, 2006)...........................32

5

*Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972) ..........................................14

6

*Deitz v. Comcast Corp.*, 2007 WL 2015440 (N.D. Cal. July 11, 2007) ........................................20

7

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ........................................................30

8

*Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168 (9th Cir. 2007) ...............................................................11

9

*Easter v. Am. West. Fin.*, 381 F.3d 948 (9th Cir. 2004).................................................................18

10

*Endres v. Wells Fargo Bank*, No. C 06-7019 PJH, 2008 WL 344204 (N.D. Cal.
11
        Feb. 6, 2008) ....................................................................................................................23

12

*Gartin v. S&M NuTec LLC*, 245 F.R.D. 429 (C.D. Cal. 2007).....................................................13

13

*Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)..............................................10, 11, 19

14

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................................22

15

*Hanna v. Plumer*, 380 U.S. 460 (1965) ........................................................................................30

16

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)........................................................11

17

*In re Copper Antitrust Litigation*, 196 F.R.D. 348 (W.D. Wisc. 2000)........................................30

18

*In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) .....................................................14

19

*Jordan v. Paul Fin., LLC,*  2009 WL 1941561 (N.D. Cal. Jul. 1, 2009) ......................................28

20

*Jordan v. Paul Financial, LLC*, 2009 WL 192888 (N.D. Cal. Jan. 27, 2009).......................passim

21

*Kingsbury v. U.S. Greenfiber, LLC*, 2009 WL 2997389 ( C.D. Cal. September 14,
22
        2009) .................................................................................................................................18

23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................................31

24

*Mahfood v. QVC, Inc.*, 2008 WL 5381088 (C.D. Cal. 2008) .......................................................23

25

*McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598 (S.D. Cal. 2007) .....................15

26

*Morgan v. County of Yolo*, 277 Fed. App'x. 734 2008 WL 2019579 (9th Cir. 2008)...................18

27

*Navellier v. Sletten*, 262 F.3d 923 (9th Cir. 2001)........................................................................20

28

*O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000)..............................30

*Plascencia v. Lending 1st Mortgage*, 2009 WL 2569732 (N.D. Cal.  Aug. 21, 2009) ...........................................................................................................................14

*Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004) ....................................11, 12, 13, 24

*Quezada v. Loan Center of California, Inc*., 2008 WL 5100241 (E.D. Cal. Nov. 26, 2008) .......................................................................................................................21

*Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004 (9th Cir. 2002) .............................................22

*Stevens v. Harper*, 213 F.R.D. 358 (E.D. Cal. 2002)...................................................................31

*Vallies v. Sky Bank*, 432 F.3d 493 (3d Cir. 2006).......................................................................23

*Yokoyama v. Midland Nat'l Life Ins. Co.*, ___ F.3d ___, 2009 WL 2634770 (9th Cir. 2009).......................................................................................................................15

*Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180 (9th Cir. 2001) ...................................10

**State Cases**

*Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. App. 4th 798; 66 Cal. Rptr. 3d 543 (Cal. App. 2 Dist. 2007).................................................................................13

*Cohen v. DirectTV, Inc.*, 2009 WL 3069116 (Cal. Ct. App. September 28, 2009) ................24, 29

*In re Tobacco II Cases*, 46 Cal. 4th 298, 207 P.3d 20, 93 Cal. Rptr. 559 (Cal. 2009) .............................................................................................................................passim

*Mass. Mut. Life Ins. Co., v. Superior Court*, 97 Cal. App. 4th 1282 (2002)..................................14

*Mirkin v. Wasserman*, 5 Cal. 4th 1082, 858 P.2d 568 (Cal. 1993) .............................12, 13, 14, 15

*Vasquez v. Superior Court,* 484 P.2d 964 (Cal. 1971)..................................................................14

**Federal Statutes**

Truth in Lending Act................................................................................................................passim

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ..............................................................................................passim

Cal. Bus. & Prof. Code § 17203 ....................................................................................................29

Cal. Bus. & Prof. Code § 17204 ..............................................................................................passim

Hawaii's Deceptive Practices Act, Ha. Rev. State § 480-2...........................................................15

**Federal Rules**

Fed. R. Civ. P. 23 ................................................................................................................passim

Fed. R. Civ. P. 23(a) ...........................................................................................................passim

Fed. R. Civ. P. 23(b) ...................................................................................................2, 10, 21, 22

Rule 10b-5....................................................................................................................................14

**State Rules**

California Code of Civil Procedure § 382 ...................................................................................29

**Other Authorities**

*Manual for Complex Litigation Third* § 30.14 (1995) ..................................................................30

**INTRODUCTION**

Quezada's argument that this case is appropriate for class treatment crumbles once the Court examines the record evidence, as it must, and ignores the conclusory and unsubstantiated arguments in her class brief. Contrary to Quezada's argument that each class member's claims can be decided by reviewing disclosures and/or omissions in "uniform" loan documents (Pl. Br. 2), the record evidence establishes:

- **Quezada's claims cannot be decided "by reviewing" the "uniform" loan documents.** Quezada testified she didn't even read the documents. Those loan documents were provided to her for the first time at the closing – weeks after she spoke with her mortgage broker, who explained several different alternative loan products available to Quezada before she decided on the option ARM product.

- **Class liability cannot be decided "on the face of the loan documents."** (Pl. Br. 2.) Loan Center originated loans through a network of mortgage brokers, and the loan officer for the mortgage broker that originated Quezada's loan – Clarion Mortgage – testified that he only originated one other loan for Loan Center. That means the putative class members here obtained their loans through numerous other mortgage brokers who are not even identified. Just like Quezada, those other borrowers likely decided to purchase the option ARM product as a result of information from their mortgage brokers. Unlike Quezada, other borrowers may have actually read the disclosures provided by Loan Center specifically explaining in very clear terms that the principal balance on their loan would increase if they chose to make the low minimum monthly payment – borrowers who understood the negative amortization feature of these loans, but still chose the product for the low monthly payment.

- **No proof of "uniform" loan documents.** The putative class includes potentially thousands of individuals throughout the United States who obtained an option ARM loan originated by Loan Center with certain "characteristics." (Pl. Br. p. 3.) Loan Center is defunct and has not appeared in this case. EMC purchased approximately 180 option ARM loans from Loan Center. Quezada's "proof" of "uniform" loan documents to support the class motion is limited to her own loan documents, and loan documents from six other loans EMC bought from Loan Center.

To determine whether Quezada has met her Rule 23 burden, the Court must examine the elements of the claims Quezada is seeking to certify and the evidence relevant to establishing those elements. Here, Quezada seeks certification only of her claims for fraud and

**THE EMC DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

violations of Cal. Bus. & Prof. Code § 17200 ("UCL"), both of which require proof of reliance and causation. Reviewing the evidence relevant to those claims, it is clear that Quezada cannot satisfy the Rule 23 elements of commonality, typicality, adequacy, or that common issues would predominate over individual issues. Further, Quezada has failed to define an ascertainable class. As a result, her motion for class certification should be denied.

Quezada cannot establish her claims are typical of the class claims or that she is an adequate class representative because her claims involve unique facts. Evidence relevant to determine reliance and causation for Quezada's fraud and UCL claims is not limited to the loan documents that she signed but includes: (i) Quezada's testimony that she does not speak or read English, did not read the loan documents but instead relied on the description of the loan terms as told to her by her insurance agent, Teresa Ortega; (ii) Teresa Ortega's testimony that she did not discuss any loan terms with Quezada, but that the Spanish-speaking notary explained all of the loan documents to Quezada at the closing; and (iii) the mortgage broker, Jose Ornelas's testimony that he explained all of the option ARM features to Quezada in Spanish in a phone conversation. Because these issues are unique to Quezada, she cannot satisfy the commonality, typicality, and adequacy requirements of Rule 23(a).

Next, Quezada cannot establish that common issues of fact predominate under Rule 23(b)(3) because determining the issues of reliance and causation for absent class members will involve numerous individualized inquiries regarding their understanding of the loan terms prior to executing the loan documents, inquiries that would predominate over any common issue. Evidence relevant to the individual circumstances of each borrower's transaction would include (i) any communications between each absent class member and their mortgage broker, the notary present at the loan closing, or any other person regarding the terms of the loan; (ii) each class member's level of sophistication or prior experience with adjustable rate mortgages and

their terms, (iii) what written materials absent class members actually received and read; and (iv) why the class member decided to enter into an option ARM loan. Given the myriad circumstances relating to the origination of each putative class member's loan – including each borrower's understanding of their loan and how they got that understanding – these individualized issues clearly predominate, precluding class treatment of these claims.

Finally, Quezada has failed to identify an ascertainable class. Her class purportedly includes all Loan Center option ARM borrowers, but Loan Center is out of business. Quezada has failed to establish how many people are in her purported class, how she proposes to identify class members, or how she would give them notice of this action if the class were certified.

For these reasons discussed more fully below, Quezada has failed to meet the requirements of Rule 23, and her motion for class certification should be denied.

## SUMMARY OF RECORD EVIDENCE

### A.    Quezada's Loan Was Originated By Clarion Mortgage, A Mortgage Broker, Working Directly With Loan Center, The Lender That Funded And Closed Her Loan.

Quezada entered into an option ARM loan with Loan Center of California on March 6, 2006 (TAC, para. 2.) She executed several documents, including an Adjustable Rate Note, Adjustable Rate Rider, Deed of Trust, two Truth in Lending Disclosure Statements (TILDS), Adjustable Rate Loan Program Disclosure ("Program Disclosure"), and an Acknowledgment of Receipt of Good Faith Estimate and Truth in Lending Act Disclosures ("Disclosures Acknowledgement") (Statement of Facts ("SOF"), paras 1-15.).[1]

---

[1] Plaintiff mistakenly refers to the Adjustable Rate Rider as a "Program Disclosure." Pl. Mot. 8. The Adjustable Rate Rider is, of course, a rider to the Adjustable Rate Note. The Program Disclosure required by TILA is a different document. *Cf.* Exhibit D, Adjustable Rate

In addition to Quezada, two other witnesses have given their depositions in this case: (i) Jose Ornelas, the loan officer from Clarion Mortgage, the mortgage broker involved with Quezada's loan, and (ii) Teresa Ortega, a life insurance agent who referred Quezada to Ornelas. As set forth below, Quezada testified that she does not speak or read English, but that Teresa Ortega told her she was getting a 1.75% rate. (SOF, paras. 16, 20.) Teresa Ortega testified otherwise. (SOF, paras. 47-49.) Teresa testified that her role was limited to filling out the credit application with information provided by Quezada, and providing that and other requested information to Jose Ornelas. (SOF, para. 43.) Teresa testified that she did not tell Quezada that she was getting a 1.75% rate, and that she did not discuss any loan terms with Quezada. (SOF, paras. 47-49.) Jose Ornelas testified that he was the loan officer for Quezada's loan, and that he discussed three different loan options with Quezada, that he explained the terms of the option ARM loan that Quezada selected, and that he explained to her that the loan would negatively amortize if she made the minimum monthly payment. (SOF, paras. 51, 59, 63, 64.)

**Josefina Quezada's Testimony**

Josefina Quezada gave her deposition testimony through an interpreter; she testified that she does not speak English and cannot read English. (SOF, para. 16.) Describing the events leading up to her option ARM loan, Quezada testified that she met with a woman, "Theresa," three times, the third time being the date she signed the loan documents. (SOF, para. 17.)

Quezada testified that the first time she met with Theresa was after Quezada received a letter in the mail, called and asked for someone who spoke Spanish. (SOF, para. 18.) Theresa came to talk to Quezada in person, but they did not discuss loan products at that the first meeting. (SOF, para. 19.) According to Quezada's testimony, Theresa later came back to her

---

Rider, Bates No. EMC/JQ 0022-0026 and Exhibit E, Program Disclosure to the Deposition of Josefina Quezada, attached to the Declaration of Stephen R. Meinertzhagen.

house and at this second meeting, she and Theresa discussed loan terms; specifically, that the loan would have a 1.75% interest rate, that the payment would be between $700 and $800, and the term would be 30 years. (SOF, para. 20.) Quezada testified that her understanding of the loan was that the payments would stay the same, because "all the times that [she had] refinanced before they payments would stay the same, and [she] never realized that it was going to change." (SOF, para. 21.)  At the second meeting with Theresa, Quezada testified that she gave the information to Theresa to fill out the loan application. (SOF, para. 22.)

Quezada testified that her third meeting with Theresa was also at Quezada's house, when Theresa came with a Spanish-speaking notary and they signed the loan documents. (SOF, para. 23.) Quezada testified that she did not ask any questions about the loan documents "[b]ecause [Theresa] spoke Spanish and I thought – I was under the impression that she was doing the right thing." (SOF, para. 24.)  Asked her understanding of the interest rate, Quezada answered: "She only spoke of 1.75." (SOF, para. 25.)

With respect to the loan documents that she signed, Quezada testified that she did not read the Adjustable Rate Note and that nobody explained it to her and she asked no questions about it. (SOF, para. 26.)  Similarly, she testified that she did not read or ask any questions about either of the two Truth in Lending Disclosure Statements (TILDS) that she signed. (SOF, para. 27.)  She also specifically testified that she did not look at any of the numbers on either of the TILDS statements.  (SOF, para. 28.)  Quezada did not read any of her Deed of Trust before she signed it.  (SOF, para. 29.)  Quezada could not remember whether she had ever seen the Adjustable Rate Mortgage Loan Disclosure Statement (Program Disclosures), or the English or Spanish versions of the Consumer Handbook on Adjustable Rate Mortgages (CHARM booklet).  (SOF, para. 30.)

Notably, asked her understanding of who she had sued, Quezada responded "I believe it was Theresa because she told me one thing and the paper said another thing." (SOF, para. 31.) Quezada further testified that she decided that she needed to hire a lawyer because Theresa, "the person that helped me didn't do the right thing." (SOF, para. 32.)  Specifically, "she was going to be with a one percent and it wasn't the one percent." (SOF, para. 32.)

Upon examination by her own counsel, Quezada's testimony changed and she testified that she remembered seeing three numbers on her Adjustable Rate Note: the date, the $252,000 amount borrowed, and the 1.75% interest rate.  (SOF, para. 33.)  She further testified that she saw the "$730.38" on one TILDS. (SOF, para. 34.)

On further examination by defense counsel, Quezada confirmed that while she saw the first number on her schedule of payments in the TILDS "$730.38," she did not see any of the figures immediately below that number (*i.e.*, showing monthly payments increasing from $785.18 to $1906.08); nor did she see the 7.863% disclosed in the APR box.  (SOF, para. 35.) Upon re-examination by her counsel, Quezada agreed that she did not look at the other numbers because the 1.75% was her understanding of the interest rate, and $730 was her understanding of the monthly payment.  (SOF, para. 36.)

**Teresa Ortega's Testimony**

Teresa Ortega had a very different recollection of Quezada's transaction.[2]  Teresa is a licensed life insurance agent and knew Quezada because she had sold her life insurance.  (SOF, para. 37.)  Teresa testified that the letter that Quezada testified about receiving and responding to by calling was for life insurance.  (SOF, para. 38.)  In a conversation that took place after

---

[2] As reflected above, the transcript of Quezada's testimony spells Ms. Ortega's name with an "h": "Theresa."  The correct spelling of Ms. Ortega's first name is "Teresa."  Because Quezada only testified regarding the first name "Teresa," and because "Ornelas" and "Ortega" are so similar, for ease of reference, Teresa Ortega will be referred to hereafter as "Teresa."

1   Teresa had sold Quezada life insurance, Quezada told Teresa that she was "having problems

2   paying the mortgage." (SOF, para. 39.)

3           Teresa knew Jose Ornelas, who worked with mortgage loans, from business contacts;

4   she would give him referrals, he would give her referrals. (SOF, para. 40.) Teresa received no

5   payment or commission from the referrals. (SOF, para. 41.) When Quezada told Teresa of her

6   mortgage payment problem, Teresa called Ornelas and gave him Quezada's name and phone

7   number. (SOF, para. 42.) Ornelas asked Teresa to go to Quezada and "fill the application"

8   which she did. (SOF, para. 43.) Teresa testified that she did not discuss types of mortgages

9   that might be available to Quezada. (SOF, para. 44.) Ornelas also asked Teresa to return to

10  Quezada's home for more information. (SOF, para. 45.) Although Ornelas did not ask Teresa

11  to go to the closing, Teresa attended the closing because Quezada asked her to. (SOF, para.

12

13  46.)

14

15          Contrary to Quezada's testimony, Teresa testified that she had no discussions with

16  Quezada about any of the loan terms, the type of loan she was getting, the different payment

17  options, the interest rate, or whether the rate was fixed or adjustable. (SOF, para. 47.) Teresa

18  testified that she never told Quezada that she was getting a loan with a fixed 1.75%. (SOF,

19  para. 48.) Teresa further testified that she did not discuss any of the loan terms with Quezada

20  at the closing. (SOF, para. 49.) According to Teresa, however, the Spanish-speaking notary

21  explained the documents to Quezada; ("I remember that he was talking different things, and at

22  the end he said, "do you have any questions?" She said, "no.") (SOF, para. 50.)

23

24  **Jose Ornelas Deposition Testimony**

25          Jose Ornelas is a loan officer for Clarion Mortgage, a licensed California mortgage

26  broker. (SOF, para. 51.) He was the loan officer for Quezada's loan; the lender was Loan

27  Center of California. (SOF, para. 52.) Ornelas testified that he served as a loan officer for only

28

two loans originated by Loan Center of California, Quezada's and one other loan.  (SOF, para. 53.)

Teresa referred Quezada to Ornelas.  (SOF, para. 54.)   After receiving a call from Teresa about Quezada, Ornelas e-mailed Teresa a loan application and disclosures regarding permission to pull credit.  (SOF, para. 55.)  Teresa "went to the client and signed everything" and sent it back to Ornelas.  (SOF, para. 56.)   After Ornelas pulled her credit, he called Quezada. (SOF, para. 56.)

Ornelas recalled four conversations with Quezada, all of which were in Spanish.  (SOF, para. 57.)  In their first conversation, Quezada asked Ornelas about the program that would require the smallest possible payment and allow the maximum cash out.  (SOF, para. 58.)  Ornelas discussed three different loan types available for Quezada's refinancing: (i) the fixed loan; (ii) the five year ARM loan; and (iii) the option ARM.  (SOF, para. 59.)  According to Ornelas, Quezada was not interested in the fixed loan, because the payment was too high.  (SOF, para. 60.)  Quezada expressed a little interest in the five year ARM, but after hearing about the option ARM loan, she decided for the option ARM.  (SOF, para. 61.)

With respect to the option ARM loan, Ornelas testified that he explained that the interest rate would be variable, not fixed, and that it would go up.  (SOF, para. 62.)  Ornelas also explained the four payment options to Quezada, that one would be close to 2%, one would be interest only, one would be 30-year, one would be 15-year.  (SOF, para. 63.)  Asked if he explained that making the minimum payment would effect the loan balance, Ornelas testified that he "told her if she sent the minimum payment, so there will be a negative amortization so it will increase."  (SOF, para. 64.)  He used the term "negative amortization" with Quezada; in Spanish: "So 'la casa se va a ir negativa.'"  (SOF, para. 65.)  Ornelas testified that he sent the good faith estimate and the closing disclosure to her three days after he pulled her credit.

(SOF, para. 66.)  Ornelas did not provide the closing documents; those were provided by Loan Center to the title company, who provided them to the notary.  (SOF, para. 67.)  Ornelas testified that the role of the notary is to explain each paper in the package, including the Note, the Deed of Trust, the payment terms and the TILDS.  (SOF, para. 68.)

Ornelas also testified that he had four other option ARM loan customers.  (SOF, para. 69.)  The one other Loan Center customer wanted an option ARM in order to make the minimum payment, then refinance again in a couple of months to a fixed loan.  (SOF, para. 69.)  Ornelas testified that he had option ARM customers from other lenders, including CME and Washington Mutual.  (SOF, para. 70.)  These customers had different reasons for getting ARM loans.  One wanted an ARM loan to flip the property in six months; another to make minimum payments on rental property, which would be covered by the rental payments.  (SOF, para. 71.)

### B.      EMC Had No Involvement In The Origination Or Closing of Quezada's Loan And Had No Contact With Quezada Prior To Closing.

In April 2005, EMC entered into a Mortgage Loan Purchase Agreement with Loan Center, under which Loan Center could sell mortgage loans meeting EMC's Seller Guide criteria to EMC.  (SOF, para. 73.)   Under the Purchase Agreement, EMC was under no obligation to purchase any mortgage loans from Loan Center.  (SOF, para. 79.)

Loan Center was a wholesale loan originator, meaning that it originated loans through a network of mortgage brokers, and funded and closed loans in its own name.  (SOF, para. 74.) Quezada obtained her loan through one such mortgage broker, Clarion Mortgage, specifically, through Jose Ornelas, a loan officer for Clarion Mortgage.  (SOF, paras. 51, 52.)  Mortgage brokers typically had the direct contact with the borrowers before their loans closed, and were responsible for gathering financial information from the borrowers and  responding to their

inquiries.  (SOF, para. 75.)   After closing, Quezada's loan was packaged with other closed loans and sold as a "bulk purchase" to EMC.  (SOF, paras. 76-81.)

The Option ARM loans EMC purchased from Loan Center were fully closed and funded before EMC acquired them.  (SOF, para. 82.)  EMC never originated mortgage loans. (SOF, para. 83.)  EMC did not market or advertise Option ARM loans to borrowers.  (SOF, para. 84.)  EMC did not have any communications with borrowers, including Quezada, prior to closing and did not participate in any closings.  (SOF, para. 85.)

<b><u>ARGUMENT</u></b>

**I.**   **<u>STANDARDS FOR DETERMINING CLASS CERTIFICATION.</u>**

Quezada "bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Rule 23(a) requires Quezada to establish numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a). Quezada moves for class certification under Rule 23(b) (3), which requires her to prove that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy [superiority]." Fed. R. Civ. P. 23(b) (3).

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982). Quezada oversimplifies the Court's task on resolving her motion for class certification by asserting that "the substantive allegations of the plaintiff's complaint must be accepted as true." (Pl. Mot. 4.) To the contrary, the Supreme Court has confirmed that the Court must make its own inquiry into the Rule 23 elements and that "actual,

not presumed, conformance with Rule 23(a)" is "indispensable." *Gen. Tel. Co. of Southwest*, 457 U.S. at 160.  To satisfy itself that the requirements of Rule 23 have been met, it is "necessary for the court to probe behind the pleadings before coming to rest on the certification question" in circumstances where, as here, the class determination "involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* With an obligation to probe behind the pleadings, courts "are not only 'at liberty to' but *must* 'consider evidence which goes to the requirements of Rule 23[at the class certification stage] even [if] the evidence may also relate to the underlying merits of the case.'" *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1177 fn. 2 (9th Cir. 2007) italics in original, quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).

To determine whether plaintiff has satisfied her burden of proving each requirement of Rule 23, this Court must examine the record evidence, and not be guided by plaintiff's unsubstantiated allegations in the complaint or the motion for class certification. Only by looking to the record evidence, as well as the elements of the claims and defenses asserted, can this Court determine whether proof of Quezada's claims would also prove the class claims. *E.g., Poulos v. Caesars World, Inc.*, 379 F.3d 654, 669 (9th Cir. 2004) (analyzing elements of claims and defenses, evidence necessary to prove those claims and defenses, and relying on record evidence to affirm denial of class certification).

As the Ninth Circuit instructs, this Court must specifically examine the elements of Quezada's fraud and UCL claims, the *evidence* relevant to prove those claims – not the unsubstantiated arguments in the class motion – and then determine whether that same proof would also prove the class claims. As discussed below, causation and reliance are both elements of Quezada's fraud and UCL claims, and the evidence relevant to those elements is inherently unique and individual to Quezada. Where, as here, individualized evidence to prove

1    plaintiff's claims is irrelevant to prove the class claims, class certification must be denied. *Id.*,

2    379 F. 3d at 665-666.

3    **II.    RELIANCE  AND  CAUSATION  ARE  ELEMENTS  OF  QUEZADA'S  FRAUD**

4    **AND UCL CLAIMS.**

5    Quezada argues that "liability is discernible on the face of the loan documents." Pl.

6    Mot. 2.  She is wrong.  In order for Quezada to recover on her UCL or fraud claims, California

7    law requires her to prove causation and reliance.

8    **A.    To Have Standing To Pursue Her UCL Claims, Quezada Must Establish**

9    **Reliance And Causation.**

10   Proposition 64 amended the standing requirements for a plaintiff seeking to assert a

11   UCL claim. *In re Tobacco II Cases*, 46 Cal. 4th 298, 315 (Cal. 2009). Section 17204 of the

12   UCL now provides that an action may be brought by "a person who has suffered injury in fact

13   and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code

14   § 17204. The California Supreme Court recently addressed this standing requirement and has

15   confirmed that "*a plaintiff must plead and prove actual reliance to satisfy the standing*

16

17   *requirement of section 17204*[.]" *In re Tobacco II Cases*, 46 Cal. 4th at 328 (emphasis added).

18   In construing the amendment to § 17204, the court observed that, given the "overriding purpose

19   of Proposition 64," the phrase "as a result of" must be construed to limit private enforcement

20   actions under the UCL. In concluding that *actual reliance* was a requirement for UCL claims,

21
     the court noted, "there is no doubt that reliance is the causal mechanism of fraud." *Id.*  Thus, in
22
23   order to recover on her UCL claim, Quezada must "prove actual reliance." *Id.*

24   **B.    Quezada's Fraud Claim Requires Proof Of Causation And Reliance.**

25   The California Supreme Court has also confirmed that reliance is an element of a cause

26   of action for deceit based on an omission. *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (Cal.

27   1993). Rejecting the argument that "it is impossible to demonstrate reliance on something that

28

one was not told," the Court held "it is not logically impossible to prove reliance on an omission. One need only prove that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Id.* More specifically, "actual reliance for the purpose of fraud by omission occurs only when the plaintiff reposes confidence in the *material completeness* of the defendant's representations, and acts upon this confidence." *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. App. 4th 798, 808 (Cal. App. 2 Dist. 2007) (emphasis in original).

### C.    No Class-Wide "Presumption" Of Reliance Applies Here.

Quezada argues that a class-wide presumption of reliance applies to this case because it involves fraudulent omissions (Pl. Mot. 20.) Addressing the same argument, the court in *Jordan v. Paul Financial, LLC*, 2009 WL 192888 (N.D. Cal. Jan. 27, 2009), concluded that reliance was required for *fraud and UCL* claims involving option ARM loans. The court in *Jordan* rejected a similar argument that the "materiality" of an omission allows a presumption of reliance. *Jordan,* at *5. The court concluded that reliance was a required element, where plaintiffs asserted that defendants' duty to disclose arose from partial representations in the loan documents. *Id.* Because the claims were based on "partial representations," the court unequivocally concluded "The Court agrees with defendants that plaintiff will have to prove that he relied on defendants' representations." *Id.* Here, Quezada similarly asserts that defendants' "duty to disclose" arises from "Defendants' partial representations" (Pl. Mot. 19), thus no presumption can apply. *Jordan*, at *5; *Poulos*, 379 F.3d at 667 (presumption of reliance inapplicable where "claims are based as much on what is *there* as what is purportedly missing"); *Gartin v. S&M NuTec LLC*, 245 F.R.D. 429, 438 (C.D. Cal. 2007) (presumption of reliance not applicable to case of mixed omissions and misstatements).

Plaintiff cites *Plascencia v. Lending 1st Mortgage*, --- F.R.D. ----, No. 07-4485 CW, 2009 WL 2569732 (N.D. Cal. Aug. 21, 2009), in support of her presumption argument. Pl. Mot. 20. In *Plascencia*, the court applied the presumption of reliance as set forth by the Supreme Court in a federal securities law decision, *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153-4 (1972). The California Supreme Court, however, *has refused to adopt and expressly rejected* application of the *Affiliated Ute* doctrine in cases involving fraudulent omissions.

> We see no reason to adopt the *Ute* presumption as California law. Contrary to plaintiffs' assertion, it is not logically impossible to prove reliance on an omission. One need only prove that, had the omitted information been disclosed, one would have been aware of it and behaved differently. Moreover, … the body of law that has developed under Rule 10b-5 is not sufficiently analogous to the law of fraud to justify its importation into the latter.

*Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (Cal. 1993). Thus *Plascencia* applied a presumption that is not applicable in California fraud cases.[3]

Similarly, Quezada's argument that "an inference of reliance arises here" (Pl. Mot. 21) fails because all of the authorities she cites involve scripted oral representations delivered to every class member. *See*, *e.g.*, *In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) (misrepresentations delivered in a "standardized sales presentation" based on uniform and centrally prepared scripts the officers were required to "memorize verbatim"). Nor does *Vasquez v. Superior Court,* 4 Cal. 800 (Cal. 1971) provide any basis for an inference of reliance. As the *Mirkin* court explained, *Vasquez* involved "peculiar facts" where the plaintiff "had pled individual reliance" and because "reliance, under the peculiar facts of the case, was

---

[3] Plaintiff's citation to *Mass. Mut. Life Ins. Co., v. Superior Court*, 97 Cal. App. 4th 1282 (2002) (Pl. Mot. 19) is similarly flawed, as that case relied on *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), a 10b-5 case that followed *Affiliated Ute*, instead of *Mirkin* which squarely rejects an attempt to import *Affiliated Ute* or other 10b-5 concepts to California fraud cases. *See Poulos v. Caesars World, Inc*., 379 F.3d 654, 664-668 (9th Cir. 2004) (explaining that "a presumption of reliance" typically only applies in securities cases).

truly a common issue" as the misrepresentations were made to each class member because the salesmen memorized a misleading statement, which was "recited by rote to every member of the class." *Mirkin*, 5 Cal. 4th at 1094. *See also McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 602 (S.D. Cal. 2007), (defendant "directed its sales representatives to memorize" and deliver a "homogenized" pitch to each customer). Here, there is no suggestion that Quezada heard a script that was repeated to every member of the class, nor is there any other basis in the record to permit an inference of class-wide reliance.[4]

Finally, *Yokoyama v. Midland Nat'l Life Ins. Co.*, --- F.3d ----, No. 07-16825, 2009 WL 2634770 (9th Cir. 2009) does not eliminate Quezada's burden of establishing reliance and causation.  *Yokoyama* involved a claim under Hawaii's Deceptive Practices Act, Ha. Rev. State § 480-2 ("Hawaii DPA"), under which a plaintiff need not establish reliance and causation to recover. *Id.*, at *1. The Hawaii DPA (like the California UCL prior to Proposition 64), only requires a showing that a practice is "likely to mislead consumers," and "actual reliance need not be established." *Id.,* at *1. Because Quezada is not seeking to certify claims under the Hawaii DPA, *Yokoyama* is inapposite.

Because causation and reliance are elements of Quezada's fraud and UCL claims, the Court must examine the evidence relevant to prove or disprove those claims, in order to determine whether class treatment of her claims is appropriate. As demonstrated below, determination of Quezada's claim will involve considering evidence that is unique to Quezada, evidence that has no bearing on any other class member.

---

[4] Jose Ornelas, who was the loan officer for Quezada's loan and worked with his friend Teresa Ortega, testified that he spoke with Quezada, and explained the loan terms to her. (SOF, paras. 55, 56.) This evidence cannot form the basis for any class-wide inference because Ornelas also testified that he only originated two loans with Loan Center of California. (SOF, para. 53.)

**III.  EVIDENCE RELEVANT TO QUEZADA'S CLAIMS GOES FAR BEYOND THE LOAN DOCUMENTS.**

Quezada would have this Court limit its analysis of the evidence relevant to providing her claims to just the Note, Deed of Trust, Program Disclosures and the TILDS, but she will have a difficult time establishing she relied on the loan documents in entering into her ban transaction. Quezada does not speak or read English.  (SOF, para. 176.) ("Q: Can you read English? A: No."). Quezada's memory of her loan closing was at best inconsistent, but in any event clearly at odds with Quezada being able to establish reliance on any purported "omissions" in her loan documents. At her deposition, she testified that she did not read the loan documents. (SOF, paras. 26-30.)  Her attorney elicited testimony that Quezada in fact "remembered" reading *only three specific numbers* (and no others) on the Note: the date, the loan amount and the initial rate and only *one number* on the TILDS, the "$730.38" first monthly payment.  (SOF, para. 36.)[5]

The evidence to be considered on Quezada's fraud claims is not limited to the loan documents.  Other relevant evidence includes information that was provided to Quezada regarding her loan from her mortgage broker. Jose Ornelas testified that he explained the terms of the option ARM loan to Quezada, in Spanish, in a telephone conversation.  (SOF, paras. 58-65.)  He explained that the interest rate was variable, not fixed, and that it would go up.  (SOF, para. 62.)  Ornelas also explained that there would be negative amortization if she only made the minimum payment; in Spanish, "la casa se va a ir negativa."  (SOF, para. 65.) Teresa Ortega further testified that the Spanish-speaking notary explained the loan documents to

---

[5] Of all of the "characteristics" that define the loans that Quezada challenges in her class definition (Pl. Mot. 3), her deposition testimony reflects that she only saw one: the initial rate on the first page. Further, she testified that she understood that this rate was fixed, not from anything in her Note, but because every time she had refinanced, the "payments would stay the same, and I never realized that it was going to change."  (SOF, para. 21.)

Quezada at the closing and that Quezada had no questions.  (SOF, para. 68.) Defendants would use all of this testimony to prove that that Quezada was not misled or deceived as a result of the loan documents.

Quezada's own testimony confirms that evidence regarding her oral communications with Teresa Ortega will be relevant to determine her fraud and UCL claims, because these communications were the basis for her entering into the option ARM loan. According to Quezada, Teresa Ortega told her that her rate was 1.75%, the payment was between $700-$800, and that the loan term would be 30 years. (SOF, para. 20.)  Quezada testified that she saw the number 1.75% on the Note, and that this was her understanding of the Note, an understanding that she got from her conversations with Ortega. (SOF, para. 36.)  On the other hand, Teresa Ortega denies that she ever discussed the loan terms with Quezada, and denies that she ever told Quezada that her loan was a 1.75 %. (SOF, para. 47.)  Teresa did testify, however, that the Spanish-speaking notary present at the closing explained the documents to Quezada. (SOF, para. 50.)

In addition to evidence regarding who told Quezada what, the fact that Quezada does not speak English presents unique challenges to Quezada's ability to establish causation, *i.e.*, that she was harmed by partial misrepresentations in the loan documents. Even if the Loan Center documents contained the "will" references that she argues should have been included (or any other corrective language that plaintiff would suggest), these words would have had absolutely no impact on Quezada. *See*, *e.g.*, Pl. Mot. 2 (defining class as loans that use "may" instead of "will" to describe increase in interest rate and negative amortization). Quezada's testimony establishes that she read none of the words in her Note and none of the words in her TILDS; thus she never saw the word "may." Consequently, Quezada could never establish that – if Loan Center had used the word "will" instead of the word "may" when referring to rate

1    increases or negative amortization – she would not have entered into the transaction. If the

2    Note had said "will" instead of "may," Quezada would have signed the documents without

3    reading them, never noticing the terms "may" or "will," modal auxiliary verbs of a language

4    that she does not speak or read.

5

6           Defendants have moved for summary judgment on Quezada's UCL and fraud claims,

7    *inter alia*, because she cannot establish reliance and causation where her testimony confirms

8    that she did not read the loan documents. Standing is a threshold issue in considering class

9    certification; where the proposed class representative lacks standing to assert the alleged

10   claims, she cannot bring the claims on behalf of putative class. *Easter v. Am. West. Fin.*, 381

11   F.3d 948, 962 (9th Cir. 2004) (upholding district court ruling that the named plaintiff lacked

12   standing "before it addressed the issue of class certification."). *Morgan v. County of Yolo*, 277

13   Fed. App'x. 734, 735, No. 06-16487, 2008 WL 2019579, at *1 (9th Cir. May 8, 2008) (where

14   named plaintiff did not have individual standing, he lacked "standing to represent a class").

15   Here, because Quezada did not read the loan documents, she cannot meet the threshold

16   standing requirements of actual reliance. *Kingsbury v. U.S. Greenfiber, LLC*, No. CV 08-00151

17   AHM, 2009 WL 2997389 (C.D. Cal. September 14, 2009) (denying motion for class

18   certification where named plaintiff lacked standing; named plaintiff testified that he did not

19   rely on any mold resistance guarantees in any statements made or materials provided by

20   defendant). Because Quezada lacks standing to challenge loan documents that she did not read,

21   she cannot represent a class challenging the loan documents. *Id.* The Court's analysis should

22

23   therefore end here. *Id.*

24

25          But even if the Court does not find that Quezada cannot establish reliance or causation

26   as a matter of law, the Court would still have to hear all of the evidence discussed above,

27

28

1   including the testimony of Quezada, Ornelas and Ortega in order to determine Quezada's fraud

2   and UCL claims.

3   **IV.   CERTIFICATION SHOULD BE DENIED BECAUSE QUEZADA CANNOT
4         SATISFY THE REQUIREMENTS OF RULE 23(a).**

5         Quezada has failed to establish the Rule 23(a) requirements of typicality, adequacy and

6   commonality. Under Rule 23(a)(3), the Court must find that "the claims or defenses of the

7   representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23

8   (a)(3). The named plaintiffs "must be part of the class and possess the same interest and suffer

9
10  the same injury as the class members." *Gen. Tel. Co.,* 457 U.S. at 156 (1982) (internal citation

11  omitted). Quezada argues that her claims are typical because "her loan documents omitted the

12  same information as those of absent class members." Pl. Mot. 14. Quezada's typicality

13  argument fails because, as demonstrated above, it is clear that resolution of Quezada's claims is

14  not limited to review of her loan documents (which she did not read) but involves the

15  testimony of many witnesses, involving communications unique to plaintiff.

16
17        The evidence relating to Quezada's fraud and UCL claims is unique to Quezada,

18  refuting her argument that her claims are typical of the class. In *Jordan v. Paul Financial, LLC*,

19  2009 WL 192888 (N.D. Cal. Jan. 27, 2009), the court denied plaintiff's motion for class

20  certification in an option ARM case because of the reliance issues unique to the plaintiff. In

21  *Jordan*, the plaintiff's deposition testimony suggested "the possibility that he did not read the

22  loan documents" and the mortgage broker's deposition testimony indicated that plaintiff was a

23  "savvy customer" and that the broker had explained to plaintiff that the minimum payment

24  could cause the balance to increase. *Id.*, at *5. After first rejecting plaintiff's argument that he

25  need not show reliance, the court concluded that the evidence established that the litigation

26  would "focus on a defense unique to plaintiff," and that "plaintiff's fraud claims are not typical

27  of the putative class." *Id. See also Hanon*, 976 F.2d at 509 (non-reliance of the named plaintiff

28

1   presented a "unique situation" and plaintiff thus failed to satisfy the typicality requirement of

2   Rule 23(a)).

3       Here, in addition to Quezada's testimony that she did not read the loan documents and

4   her disputed testimony that Teresa Ortega told her that her loan had a 1.75% rate, there is also

5   testimony in the record indicating that Jose Ornelas, the mortgage broker, explained the option

6   ARM loan terms to Quezada in a phone conversation, and that the notary explained the terms

7   to Quezada at the closing.   The issues of Quezada's individual reliance and causation are

8   
9   unique to Quezada and would involve evidence that is irrelevant to any other class member.

10  Because her claims are not typical, her class motion should be denied. *Id.*; *Jordan*, at *5. *See*

11  *also Deitz v. Comcast Corp*., No. C 06-06352 WHA, 2007 WL 2015440, at *5 (N.D. Cal. Jul.

12  11, 2007) (denying class certification where plaintiff did not establish typicality: "Because

13  plaintiff did not read any of Comcast's communications, he will be subject to a unique defense

14  that he did not read, and thus could not have relied on, any of the misstatements.")

15  
16      Rule 23(a)(4) requires Quezada to prove that she will "fairly and adequately protect the

17  interest of the class." Fed. R. Civ. P. 23(a)(4). Because her claims are unique, Quezada does

18  not satisfy the adequacy requirement of Rule 23(a)(4). *Navellier v. Sletten*, 262 F.3d 923, 941

19  
20  (9th Cir. 2001) (upholding denial of certification because named plaintiff's claim was subject to

21  unique defenses, therefore he was not an adequate class representative).[6]

22      Quezada has also failed to meet the commonality requirement of Rule 23(a)(2). She

23  identifies three "core questions" that she contends are common to all class members: (1)

24  _____

25  
26      [6] For the reasons discussed in Part VI below, Quezada also fails to satisfy the
    numerosity requirement of Rule 23(a)(1). Quezada only submits her loan documents, and

27  certain loan documents of six other loans EMC purchased from Loan Center, but no evidence
    establishing that the number of borrowers who actually have the same documents as Quezada

28  is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(4).

whether the loan documents fail to disclose that the payment amounts were insufficient to cover principal and interest; (2) whether the loan documents fail to disclose that negative amortization was certain to occur if plaintiff made minimum payments; and (3) whether the omitted information was material, to trigger liability under UCL and common law fraud. Pl. Mot. 13.   The first two "questions," however, are moot because this Court has already answered these questions in the negative. In the Court's earlier opinion, the Court rejected plaintiff's arguments regarding negative amortization. Specifically, the Court pointed to the following language in bold typeface on the first page of the Note:

> MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED.

*See Quezada v. Loan Center of California, Inc*., No. CIV 08-177 WBS KJM,  2008 WL 5100241, at *8 (E.D. Cal. Nov. 26, 2008) (holding that Quezada's loan terms are enforceable, that the loan provisions "indicate that monthly payments could be insufficient to cover the interest owed on the OARM" and that the "Note Holder would apply the payment to the interest owed and add the difference to the principal balance"). "[T]he very conduct underlying plaintiff's claim is that which the contract directs defendants to perform." *Id.*, at *9. The third "question" Quezada identifies is not a common question. As discussed above, labeling a term "material" does not "trigger" liability; liability is only imposed where there is actual reliance on a purported omission that causes damages. *See supra,* Section II.   Because Quezada has not satisfied the requirements of Rule 23(a), her motion should be denied.

## V.   INDIVIDUAL ISSUES OF RELIANCE AND CAUSATION PREDOMINATE OVER ANY COMMON ISSUES, THUS DESTROYING THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF RULE 23(b) (3).

Under Rule 23(b)(3), courts must analyze whether the party seeking certification has established that "questions of law or fact common to the members of the  class predominate

over any questions affecting only individual members [predominance], and that a class action

is superior to other available methods for the fair and efficient adjudication of the controversy

[superiority]." Fed. R. Civ. P. 23(b) (3). To satisfy the predominance requirement, Quezada

must show that "common questions present a significant aspect of the case and they can be

resolved for all members of the class in a single adjudication." *Hanlon v. Chrysler Corp.*, 150

F.3d 1011, 1022 (9th Cir. 1998).[7]

### A.      Individual Issues Relating To Absent Class Members' Fraud and UCL Claims

Quezada's argument that common issues predominate rests on two faulty premises, that

her claims can be resolved "on the face of the documents" (Pl. Mot. 19) and that a

"presumption of reliance applies here" (Pl. Mot. 20). As established above, no presumption of

reliance applies here, nor can Quezada's claims be resolved solely by looking at loan

documents. The same is true for anyone else who may be included in the class – their fraud and

UCL claims can only be resolved by the evidence unique to them. This includes evidence

relating to conversations with mortgage brokers, whether any absent class members read any

loan documents, the level of sophistication of the putative class member, receipt of other loan

information – such as the CHARM booklet, and the borrower's reasons for entering into an

option ARM loan. All of these issues are as individual to each class member as they are to

Quezada.

### 1.      Absent Class Member Discussions With Mortgage Brokers

The universe of relevant evidence relating to adjudication of absent class members'

UCL and fraud claims is even broader than the evidence relating to Quezada's claim, as it

---

[7] Because individual issues predominate in this case, Quezada cannot meet Rule 23(b)(3)'s superiority requirement. *Schuetz v. Banc One Mortg. Corp.*, 292 F.3d 1004, 1014 (9th Cir. 2002) (upholding denial of certification because where "individual issues predominate, … a class action is also not superior").

would involve numerous individual issues relevant to the circumstances surrounding each class member's decision to enter into an option ARM loan. This evidence would include conversations that each class member had with his or her mortgage broker, including inquiry into whether the broker explained the loan terms to the borrower.[8] Any discussions that class members had with mortgage brokers is particularly critical because Quezada and other class members generally did not see the Adjustable Rate Note, the Deed of Trust, and the TILDS until the date of the closing, *after* they had made the decision to obtain an option ARM loan over other loans offered. Chronologically, this suggests that their understanding or misunderstanding of the loan terms was not a result of the loan documents, but because of these prior conversations. Indeed, Quezada testified that she understood she had a 1.75% rate for 30 years based on conversations with Teresa Ortega prior to her closing.

Because each absent class member had different conversations with different mortgage brokers or other parties regarding option ARM loans, individual issues predominate. *Endres v. Wells Fargo Bank*, No. C 06-7019 PJH, 2008 WL 344204 *12 (N.D. Cal. Feb. 6, 2008) (denying class certification where individual issues predominated on liability issues, such as "whether and when a particular class member heard or read the alleged misrepresentations (or the Bank's disclosures)"); *Mahfood v. QVC, Inc.*, No. SACV 06-0659-AG, 2008 WL 5381088, at *4-5 (C.D. Cal. Sep. 22, 2008) (denying class certification where evidence of reliance and causation would not be limited to website television programming, individual issues predominated where consumers heard or saw different representations, which impacted whether purchasers in fact relied or were misled by "false sense of urgency" of "Introductory

---

[8] Quezada's argument that the broker testimony is irrelevant under *Yokoyama* (Pl. Mot 23) is wrong because Quezada is not bringing claims under the Hawaii DPA. Similarly, *Vallies v. Sky Bank*, 432 F.3d 493, 494 (3d Cir. 2006), a TILA case, does not preclude defendants from using broker testimony. Quezada argues that TILA duties are non-delegable (Pl. Mot. 23), but she does not seeking to certify a TILA claim.

Price" or "Retail Value" references); *Cohen v. DirectTV, Inc.*, No. B204986, 2009 WL 3069116, at *10 (Cal. Ct. App. Sep. 28, 2009) (affirming denial of class certification of UCL and fraud claims, where evidence of reliance and causation would not be limited to misleading ads, rather, individual fact issues predominated, including questions regarding whether absent class members ever saw advertisements prior to their decision to purchase "high definition" or "HD" services, whether their decision to purchase was based on word of mouth or having seen HD at a store or a friend's house).

### 2.   Absent Class Member Sophistication/Experience With ARM Loans

Other relevant evidence would include the level of sophistication or prior experience with option ARM loans of any class member. *See Jordan*, at *5 (finding relevant reliance evidence includes: "plaintiff's working relationship with his mortgage broker, his prior experience with mortgage products and the possibility that he did not read the loan documents"). Clearly, if an absent class member had prior experience in the mortgage industry or prior personal experience with ARMs or option ARM loans, this experience would be relevant to his or her fraud and UCL claims. *Id.; see also Poulos*, 379 F.3d at 665 (affirming denial of class certification, evidence not limited to labels on gaming machines, predominating individual issues included class member gambling experience and reasons for playing; some class members "may have played with no knowledge" others "may have played fully aware of how the machines operate").

### 3.   The CHARM Booklet

Critical evidence also includes the Consumer Handbook on Adjustable-Rate Mortgages ("CHARM booklet") which, pursuant to TILA regulations, must be delivered to each ARM

borrower. (*See* http://www.federalreserve.gov/pubs/arms/armsbrochure.pdf.)[9] While Quezada

testified that she did not remember seeing the English or Spanish versions of the CHARM

booklet (SOF, para. 30.), evidence relating to whether other class members received and read

the CHARM booklet would be highly relevant to resolving their fraud and UCL claims. The

CHARM booklet describes a payment-option ARM in very clear terms. It is an adjustable-rate

mortgage that allows the borrower to choose among several payment options each month,

which typically include: (1) a traditional payment of principal and interest based on a set loan

term of 15 or 30 years; (2) an interest-only payment, which pays the interest but does not

reduce the principal balance of the loan; or (3) a minimum payment that is typically less than

the total interest due. (Meinerzhagen Decl., Ex. A., J. Quezdada Dep., Ex. F.) The booklet

explains that the initial interest rate for some option ARM loans is typically very low for the

first few months, and for those loans, the monthly payments for the first year are usually based

on the initial low interest rate. For borrowers with a low initial interest rate, they are told that:

> Your payments during the first year are based on the initial low rate, meaning that if you only make the minimum payment each month, it will not reduce the amount you owe and it may not cover the interest due. The unpaid interest is added to the amount you owe on the mortgage, and your loan balance increases. This is called *negative amortization*. This means that even after making many payments, you could owe more than you did at the beginning of the loan.

(*Id.* p. 17, emphasis in original.)

The CHARM booklet explains how option ARM loans work, what the payment options

are, and how payment caps can lead to negative amortization. While Quezada does not include

the CHARM booklet in her list of deficient "loan documents," whether any class member

---

[9] The specific CHARM brochure referenced here was revised in December of 2006. Federal law requires the CHARM brochure to be provided to all borrowers applying for an ARM loan. Quezada testified at her deposition that she does not remember either the English or Spanish language versions of a CHARM brochure. (SOF, para. 30.) Putative class members with loans originated after December 2006 should have received the version of the CHARM brochure quoted in this brief.

25

received this document and would be relevant to claims that absent class members were defrauded by the loan documents.[10] *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (affirming denial of class certification, plaintiff claimed that she was deceived because fountain Diet Coke had a mix of aspartame and saccharine rather than only aspartame, but proposed class could include "millions who were not deceived," *i.e.*, those "who knew fountain Diet Coke contained saccharin and bought it anyway.").

**4.      Absent Class Member Reasons For Choosing An Option ARM Loan**

Quezada's claim is based on layers of assumptions culminating in the conclusion that options ARMs are so unfair that anybody who got an option ARM did not know what they were getting. Rejecting this reasoning, the *Jordan* court pointed out "it is plausible that plaintiff signed the mortgage note because he believed it would benefit him." *Jordan*, at *5. Absent class members would each have their own reasons for wanting, or needing, a low monthly mortgage payment. Absent class members would also have had their own views on whether the value of their property would increase, thereby increasing their equity even if their loan balance was negatively amortizing. Jose Ornelas testified that his other option ARM customers entered into loans for various financial reasons, including the borrower's desire to make minimal payments until the property was sold or refinanced, or to make minimal payments that would be covered by rental payments. (SOF, para. 71.)   Absent class member reasons for entering

---

[10] There is nothing inherently deceptive or illegal about option ARM loans. The Federal Reserve Board ("FRB") publishes a brochure for borrowers specifically addressing payment-option ARMs, and advises borrowers of the circumstances under which that type of loan product may be right for the borrower, as well as the circumstances under which an option ARM would not make sense for the borrower. (*See* "Interest-Only Mortgage Payments and Payment-Option ARMs – Are They for You?" attached to Meinertzhagen Decl. as Ex. D, p. 7.) This FRB brochure, which provides significant details on the option ARM loan, is specifically referenced in the December 2006 CHARM brochure for borrowers who seek more information about the pros and cons of an option ARM loan. (*See* http://www.federalreserve.gov/pubs/arms/armsbrochure.pdf.)

1   into option ARM loans is an individualized issue, precluding class treatment. *Dietz,* at *6

2   (while defendant's "welcome kit" was uniform, individual causation issues predominated

3   "because of the variety of possible reasons that a subscriber rented the equipment at issue" was

4   relevant to whether the "subscriber would have rented the equipment anyway").

5

6   All of this evidence would be relevant to absent class member fraud and UCL claims,

7   evidence which requires inquiry into each borrower's loan transaction with their mortgage

8   broker and Loan Center. Where, as here, resolution of class members' fraud and UCL claims

9   would require inquiry into the circumstances surrounding each absent class member's

10   transaction in order to establish the elements of reliance and causation, plaintiff cannot satisfy

11   the predominance requirement of Rule 23.

12       **B.    Quezada's Arguments That Her Claims Can Be Decided With Class-Wide
13               Proof Are Based On Unsubstantiated Statements That Ignore The Record
14               Evidence And Misstate The Law.**

15   As discussed above, Quezada's arguments regarding "presumptions" or "inferences" for

16   her fraud claims are without merit. Quezada raises additional arguments attempting to establish

17   that common issues predominate on her UCL claim, but these arguments ignore the fact that

18   Proposition 64 has completely altered the landscape for § 17200 claims. Quezada argues that

19   her UCL claims raise common issues because (i) her "unlawful" claim involves TILA

20   violations that can be adjudicated "by reference to the loan documents"; (ii) her "unfair" claim

21   turns on "materiality"; and (iii) under the "fraudulent" prong, plaintiff need only show that the

22   practices are "likely to deceive." (Pl. Mot. 22.) Quezada is wrong. In order to bring a § 17200

23   claim under any of its three prongs, Quezada must meet the standing requirements of § 17204.

24   She must show that she "suffered injury in fact and has lost money or property as a result of the

25   unfair competition." Cal. Bus. & Prof. Code § 17204. Thus she must show reliance and

26   causation for her "unlawful" "unfair" and "fraudulent" claims. Further, nothing in *Tobacco II*

27

28

1    would allow Quezada to pursue a representative action under Rule 23 on behalf of purported

2    class members who had suffered no injury.

3            Contrary to her suggestion, Quezada's "unlawful" claim based on purported TILA

4    violations cannot be resolved "by reference to the loan documents." (Pl. Opp. 22.) To have

5    standing to prosecute her UCL claim, § 17204 requires that Quezada establish that she suffered

6    injury in fact as a result of the purported TILA violation in the TILDS or program disclosures

7    (which she testified did not read). Because she must establish actual reliance in order to have

8

9    standing, Quezada's claim cannot be resolved by simply looking at the loan documents. Rather,

10   all of the evidence discussed above relating to the events leading up to her loan closing is

11   relevant to determining her claim. Further, as explained above, whether Quezada suffered

12   injury as a result of these disclosures is not an issue that is common to the class. Moreover,

13   Quezada provides no evidence for her statement that all of the "TILDS contained identical

14   language." Pl. Mot. 7. The Shub Declaration that Quezada cites in support of her statement,

15   contains only Quezada's TILDS. Finally, Quezada cannot bring a UCL claim based on a TILA

16   violation because her TILA claim is time barred as she brought this suit after the expiration of

17

18   the one-year statute of limitations. *Jordan v. Paul Fin., LLC*, --- F. Supp. 2d ---, No. C 07-

19   04496 SI, 2009 WL 1941561, at *13 (N.D. Cal. Jul. 1, 2009) (dismissing "unlawful" UCL

20   claim in Option ARM case where TILA claims were time-barred, and collecting cases holding

21

22   the same).

23           Similarly, Quezada's assertion that her "unfair" and "fraudulent" claims can proceed

24   upon a showing that practices are "likely to deceive," fails because all of her authorities pre-

25   date Proposition 64 and do not address the current "injury in fact" and "as a result of" standard

26   that Quezada must now meet. *In re Tobacco II Cases*, 46 Cal. 4th at 328.  *Cf.* cases cited by

27

28   Quezada at Pl. Mot. 22: *Day v. AT&T Corp.*, 63 Cal. App. 4th 325 (1998) (construing § 17200

as it existed prior to Proposition 64); *Heighley v. J C. Penney Life Ins. Co.*, 257 F. Supp. 2d 1241, 1259 (C.D. Cal. 2003) (same); *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 449-450(1979) (construing § 17535 as it existed prior to Proposition 64).

Quezada's final argument that the class would not have to prove individual reliance and causation citing *Tobacco II* (Pl. Opp. 22), fails for two reasons. First, contrary to Quezada's suggestion (Pl. Mot. 23), *Tobacco II* did not address the class certification questions of typicality, commonality, and predominance. *Tobacco II* addressed *standing*. A California appellate court recently rejected the same *Tobacco II* argument Quezada presents here. The plaintiff in *Cohen v. Direct TV, Inc,* 2009 WL 3069116 (Cal. App. 2d Dist. Sept. 28, 2009), appealed the denial of class certification of his UCL claim, arguing that under the reasoning of *Tobacco II*, the trial court erred in determining that individual issues of fact predominated over common issues. The appellate court affirmed the denial of class certification, rejecting plaintiff's reliance on *Tobacco II* as misplaced:

> We find *Tobacco II to* be irrelevant because the issue of "standing" simply is not the same thing as the issue of 'commonality.' Standing, generally speaking, is a matter addressed to the trial court's jurisdiction because a plaintiff who lacks standing cannot state a valid cause of action. Commonality, on the other hand and in the context of the class certification issue, is a matter addressed to the practicalities and utilities of litigating a class action in the trial court. We see no language in *Tobacco II* which suggests to us that the Supreme Court intended our state's trial courts to dispatch with an examination of commonality when addressing a motion for class certification.

*Id.*, at *10 (internal citations omitted).[11]

---

[11] Proposition 64 did not change the requirements of proving class prerequisites in order to maintain a class action. To the contrary, Proposition 64 amended the standing requirement for UCL actions found in § 17204 and also amended the remedy provision of § 17203, expressly referencing the need to meet the class action requirements of the California Code of Civil Procedure: "Any person may pursue representative claims or relief on behalf of others only if the claimant *meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure.*" Cal. Bus. & Prof. Code § 17203 (as amended by Proposition 64) (emphasis added). Here, Quezada's request for class treatment fails because she

Second, Rule 23 governs Quezada's motion for class certification. It is well-established that federal district courts sitting in diversity "apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). Thus, nothing in *Tobacco II* affects the application of Rule 23 and its requirement that absent class members have standing. "Implicit in Rule 23 is the requirement that the plaintiffs and the class they seek to represent have standing. This is a threshold requirement for the maintenance of a federal class action and must be considered in addition to the requirements of Rule 23." *In re Copper Antitrust Litigation*, 196 F.R.D. 348, 353 (W.D. Wisc. 2000) (internal citations omitted). Under Rule 23, "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). Quezada's argument that she can represent class members who have no injury-in-fact must be rejected.

## VI.   QUEZADA HAS FAILED TO IDENTIFY AN ASCERTAINABLE CLASS.

The class definition must be "'precise, objective, and presently ascertainable.'" *O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 416 (C.D. Cal. 2000) (quoting *Manual for Complex Litigation Third* § 30.14 at 217 (1995)).[12]

---

cannot meet the standing requirements of Section 17204, and has not established the prerequisites for class certification of Rule 23.

[12] In her motion, Quezada seeks to certify the following class.

All individuals in the United States of America who, between January 24, 2004 and the date that notice is mailed to the Class, obtained an Option ARM loan originated by LOAN CENTER OF CALIFORNIA, INC. with the following characteristics:

(i) The numerical interest rate listed on page one of the Promissory Note is 3.0% or less;

(ii) The Note uses the term "may" instead of "will or shall" change when describing an increase of the listed numerical rate. *E.g.*: "The interest rate I will pay may change";

(iii) The margin amount added to the index for the loan is equal to or greater than 1.75%;

1    Quezada's class definition is not precise, objective, or presently ascertainable. She seeks

2    a class of all option ARMs originated by Loan Center of California, but this entity is now

3    defunct. While Quezada concedes that "the exact size of the Class in this case is unknown at

4    present" (Pl. Mot. 12.), she presents no plan as to how she might go about identifying the class,

5    or determining its size. Because the class is not presently ascertainable, class certification must

6    be denied until plaintiff can establish all of the required element under Rule 23. *Stevens v.*

7    *Harper*, 213 F.R.D. 358, 377-78 (E.D. Cal. 2002) ("actual, not presumed, compliance with

8    Rule 23 remains the touchstone for class certification") (internal citations and quotations

9    omitted).

10

11    Quezada states that she "has identified at least 181 Loan Center loans serviced by

12    Defendant EMC." (Pl. Mot. 12.) This number only demonstrates the flaw in her class

13    definition, which is not limited to loans originated by Loan Center and sold to EMC but

14    includes all Loan Center loan with Notes that contain certain characteristics. Quezada presents

15    no evidence to suggest that all Loan Center loans were purchased by EMC.[13] Quezada also has

16    provided no evidence that each of the approximately 181 loans originated by Loan Center and

17    sold to EMC contain the four terms outlined in the class definition, or that these loans contain

18

19

20    _____

21        (iv) The promissory note does not contain any statement that paying the amount
         listed as the "initial monthly payment" "will," as opposed to "may," result in
22        negative amortization after the first interest rate change date.

23    (Pl. Mot. 3.)

24        [13] Quezada does not have standing to assert claims against defendants on behalf of any
      Loan Center borrower whose loans were not held by defendants. Article III standing requires
25    three elements: (1) injury-in-fact; (2) traceability; and (3) redressability. *Lujan v. Defenders of
      Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Quezada cannot establish traceability for putative
26    class members' loans not sold to defendants, because traceability "requires that there be 'a
      causal connection between the injury and the conduct complained of – the injury has to be
27    fairly traceable to the challenged action of the defendant.'" *Jordan*, 2009 WL 192888, at *4,
      *citing Lujan*, 504 U.S. at 560.

28

1   the statements she challenges in her motion. Nor has Quezada established that all of the loans

2   sold to EMC contain the prepayment penalty rider that she challenges.

3       Quezada's motion argues that "Each of the Notes … used by Defendants during the

4   relevant time period contains the same statements and omissions." (Pl. Mot. 6.) Quezada

5   presents no evidence supporting this statement. She cites the Shub Declaration and its Exs. 1-

6   4, but those documents do not establish anything regarding other class members' forms; the

7   exhibits are *only Quezada's loan documents*. Plaintiff's unsupported arguments regarding her

8   class definition and its ascertainability do not satisfy Rule 23.  For the same reasons, she cannot

9   establish that "the class is so numerous that joinder of all class members is impracticable

10  [numerosity]" as required by Rule 23(a)(1). *See Adams v. U.S.*, No. CIVS040979, 2006 WL

11  618293, at *2 (E.D. Cal. Mar. 10, 2006) (holding that numerosity requirement was not satisfied

12  where plaintiffs claimed – without evidence – that defendant had a list of people harmed by

13  defendants' conduct and had received over 300 calls to the putative class hotline).

14      Similarly, Quezada asserts that defendants "possess the physical addresses of *most*

15  Class members" (Pl. Mot. 26) (emphasis added), but Quezada presents no evidence supporting

16  this statement because she has not even outlined the total purported class size. There is no

17  evidence from which anyone could conclude what percentage of the Loan Center ARMs were

18  assigned to EMC; *i.e.*, whether EMC has the "physical addresses" of 10% or 50% of the class.

19  Quezada has requested certification of a class but has failed to show the number of purported

20  class members, how those class members would be identified or how those class members

21  would be notified.[14]

[14] Plaintiff's counsel's *modus operandi* in these Option Arm cases appears to include revising the class definition in the reply brief, then again at the hearing for class certification. *See Plascencia*, 2009 WL 2569732, at *3, 6, 8; *Jordan*, 2009 WL 19288, at *6. Should the same tactics be employed here, defendants object to these practices as unfair and prejudicial

1

## <u>CONCLUSION</u>

2

Here, Quezada was not misled by the loan documents, she has failed to establish that

3

her claims are typical or common to the class, and individual issues of reliance and causation

4

would clearly predominate in any class adjudication. Because Quezada has not satisfied the

5

requirements of Rule 23, her motion for class certification should be denied.

6

7

8

Dated: October 30, 2009            SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

9

By: _____/s/ Shannon Z. Petersen_____

10

Attorney for Defendants

11

EMC MORTGAGE CORPORATION,
STRUCTURED ASSET MORTGAGE

12

INVESTMENTS II, INC., AND BANK OF NEW
YORK MELLON CORPORATION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

because this piecemeal approach deprives defendants of the opportunity to fully brief class
treatment of a proposed class. Instead, defendants must use their opposition brief to respond to
issues that plaintiff later abandons. Further class definition revisions at oral argument are

27

similarly prejudicial, where rather than defend the class proposed, plaintiff continuously
presents a moving target.

28

*Quezada v. Loan Center of California*
United States District Court, Eastern District Of California (Sacramento),
Case No. CIV 08-00177 WBS KJM

CERTIFICATE OF SERVICE

I am employed in the County of San Diego; I am over the age of eighteen years and not a party to the within entitled action; my business address is 501 West Broadway, 19th Floor, San Diego, California 92101-3598.

On **October 30, 2009**, I served the following document(s) described as

**EMC MORTGAGE CORPORATION, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., THE BANK OF NEW YORK MELLON CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**EMC MORTGAGE CORPORATION, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., THE BANK OF NEW YORK MELLON CORPORATION'S STATEMENT OF FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**DECLARATION OF STEPHEN R. MEINERTZHAGEN IN SUPPORT OF EMC MORTGAGE CORPORATION, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., AND THE BANK OF NEW YORK MELLON CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**DECLARATION OF MARY HAGGERTY IN SUPPORT OF EMC MORTGAGE CORPORATION, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., AND THE BANK OF NEW YORK MELLON CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

on the interested party(ies) in this action as follows:

**Electronic Mail Notice List**

**The following are those who are currently on the list to receive email notices for this case:**

David M. Arbogast, Esq.                          Attorneys for Plaintiff
Jeffrey K. Berns, Esq.                           Josefina Quezada
Arbogast and Berns LLP
6303 Owensmouth Ave., 10th Floor
Woodland Hills, CA  91367-2263
Tel: 818-961-2000/Fax: 818-93600232
Email: darbogast@law111.com; Jberns@law111.com

Jonathan Shub, Esq.                              Attorneys for Plaintiff
Seeger Weiss LLP                                 Josefina Quezada
1515 Market Street, Suite 1380
Philadelphia, PA  19102
Tel: 215-564-2300/Fax: 215-851-8029
Email: jshub@seegerweiss.com

W02-WEST:8SZP1\401190824.1

CERTIFICATE OF SERVICE
USDC, Eastern Case No. 08-cv-00177-WBS-KJM

| | |
|---|---|
| 1 | Christopher A. Seeger, Esq.<br>Seeger Weiss LLP |
| 2 | 1 William Street<br>New York, NY  10004 |
| 3 | Tel: 212-584-0700/Fax: 212-584-0799<br>Email: cseeger@seegerweiss.com |

Attorneys for Plaintiff
Josefina Quezada, Admitted
*Pro Hac Vice*

| | |
|---|---|
| 4 | |
| 5 | Stephen R. Meinertzhagen, Esq., Admitted Pro Hac Vice<br>LeAnn Pedersen Pope, Esq., Admitted Pro Hac Vice |
| 6 | Burke Warren MacKay & Serritella, P.C.<br>330 North Wabash, 22nd Floor<br>Chicago, IL 60611 |
| 7 | Tel: (312) 840-7013/Fax: (312) 840-7047<br>Email: lpope@burkelaw.com, |
| 8 | smeinertzhagen@burkelaw.com |

Attorneys for Defendant
EMC Mortgage Corporation,
Structured Asset Mortgage
Investments II, Inc., and The
Bank of New York Mellon

| | |
|---|---|
| 9 | Ted C. Lindquist , III<br>Sheppard Mullin Richter & Hampton, LLP |
| 10 | Four Embarcadero Center, 17th Floor<br>San Francisco , CA  94111 |
| 11 | Tel: (415) 774-2935/Fax: (415) 434-3947<br>Email: tlindquist@sheppardmullin.com |

Attorneys for Defendant
EMC Mortgage Corporation,
Structured Asset Mortgage
Investments II, Inc., and The
Bank of New York Mellon

**Also served on:**

| | |
|---|---|
| 14 | Robert S. Beall, Esq.<br>Sheppard Mullin Richter and Hampton LLP |
| 15 | 650 Town Center Drive, 4th Floor<br>Costa Mesa , CA 92626 |
| 16 | Tel: 714-513-5100/Fax: 714-513-5130<br>Email: rbeall@sheppardmullin.com |

Attorneys for Defendant EMC
Mortgage Corporation,
Structured Asset Mortgage
Investments II, Inc., and The
Bank of New York Mellon

☒   **BY ELECTRONIC MAIL:** Said document(s) was transmitted by electronic mail
The name(s) and email addresses of the person(s) served are set forth in the service
list.

☒   **FEDERAL:** I declare that I am employed in the office of a member of the bar of
this Court at whose direction the service was made. I declare under penalty of
perjury under the laws of the United States of America that the foregoing is true and
correct.

Executed on **October 30, 2009**, at San Diego, California.

_____
Phyllis Chavez